**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

Appeal of Carl James Anderson }
                               }
                               }     Docket No. 219-10-02 Vtec
                               }
                               }

Decision and Order

Appellant Carl James (" Jim" ) Anderson appealed from a decision of the Development Review Board (DRB) of the City of Burlington approving an application for approval of a 40-unit residential apartment building at 300 Lake Street in the City of Burlington. Appellant appeared and represented himself; Appellee-Applicants Burlington Community Land Trust and Housing Vermont are represented by Richard C. Whittlesey, Esq.; the City of Burlington is represented by Kimberley J. Sturtevant, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence and the written memoranda and proposed findings, the Court finds and concludes as follows. All section references are to the Zoning Ordinance of the City of Burlington, unless otherwise noted.

Appellee-Applicants propose to construct a 40-unit apartment building on the lower portion of a vacant 1.65-acre roughly triangular lot bordered by Depot Street to the southeast, the railroad tracks to the west, and land of Burlington College to the north. The property is located in the Waterfront Residential Medium Density zoning district, in which multi-family apartment housing is a permitted residential use. From the building site the land slopes steeply upwards to the north, to a plateau at the elevation of North Avenue at the Burlington College buildings. From the building site the land also slopes steeply upwards to the east, across Depot Street and continuing upwards to the building sites on the west side of North Avenue. Depot Street slants diagonally down from North Avenue to Lake Street along the southeasterly boundary of the site. Depot Street is at present restricted in use due to the instability of the slope and the potential for subsidence. It is not a through-way and is basically only used for emergency access. Appellant lives in a building at the top of the slope which could potentially be affected by such subsidence.

In connection with this project, Appellee-Applicants propose to stabilize the slope by site engineering methods involving the reshaping and regrading of the bank to the east of the building site and insertion of a geo-grid. Trees will only be removed where necessary to improve the slope of the land; that is, to flatten or reduce the degree of slope. Except where necessary to stabilize the slope, or to remove dead trees, the grove of cottonwood trees existing to the east and southeast of the proposed building site will be preserved. After regrading, the slope will be replanted with 610 staghorn sumacs, whose root systems will further help to stabilize the slope, and jute matting will be placed to stabilize the slope as the vegetation regrows. Because the property had been in industrial use in the past, topsoil on the disturbed areas of the property will

be stripped and tested for contamination. Soils that test clean will be reused on the site; those that are contaminated will be disposed of properly.

Appellee-Applicants propose to construct a four-story L-shaped residential building on the lot, to provide forty housing units, of which 34 are proposed as so-called ' affordable' units, that is, affordable for those with less than 80% of the area' s median income, so that the project qualifies under Article 14 of the Zoning Ordinance regarding Inclusionary Housing. There will be eighteen two-bedroom units, with the remainder being one- and three-bedroom units. The project is intended to provide affordable, safe, decent housing for families.

The building is located at the foot of an existing hill, and is designed so that it will not interrupt the ridgeline above, that is, it will not interrupt the view of the City' s skyline from areas near the lake looking towards the east, and will not interrupt the view of the lake from buildings or public areas at the top of the slope looking towards the west. The building itself is well-designed visually to bridge the differences in building mass and materials from the large industrial Moran plant up to the residential and institutional buildings such as the Commodore condominiums, the Burlington Police Department building, and the Burlington College buildings along North Avenue. The building is designed so that the units either have decks or patios, or have large sliding windows with railings, to give access or the sense of access to the outdoors and to break up the scale of the building facades. The materials proposed for the building are brick, fiber-cement clapboard, and vertical metal siding, to relate the building to the industrial waterfront setting but to give it a more comfortable residential scale. For the same reason, the mass of the building is interrupted by the use of the vertical metal siding on the fourth floor, and brick at the base, to avoid a monolithic look. The roof overhang provides shading in the summer, and also casts a shadow line that further adds to the design sense of the building as residential in scale. The parking garage under the building has been designed to be open to view from outside, to enhance the safety of the garage space. The L-shape of the building provides an open triangular courtyard of space between the building, the parking area, and the railroad tracks, suitable for gardening or play area, and capable of providing a clear turnaround space for emergency vehicles.

Access to the building is via an extension of Lake Street, which narrows between two trees to enter the parking lot for the building. The improvements to Lake Street and to the stormwater collection system for Lake Street are proposed to be completed on a schedule to tie in to the parking lot and access for the building, and the stormwater system for the building and its surroundings.

The proposed apartment building must comply with the City' s Zoning Ordinance, and in particular Article 5 (Use and Dimensional Requirements), Article 6 (Design Review), Article 7 (Site Plan Review, which allows the substitution of appropriate design review criteria through § 7.1.7), Article 10 (Parking), Article 13 (Major Impact Developments); Article 14 (Inclusionary Zoning) and the Conditional Use criteria from Article 17, made applicable through to the project by Article 13.1.5.

Appellee-Applicants propose to accept and to incorporate into the application before the Court the City's so-called standard conditions of approval, and the following specific conditions of approval proposed by the City.

Related to design and pre-construction

1. That the project be granted a parking waiver for up to 23 spaces, based on the parking needs characteristic of affordable housing units, and this property's proximity to the bike path and to public transportation, and that the Applicant/Property Owner applicant investigate providing its tenants of other transportation alternatives, such as implementing a so-called ride-share or car-share program.

2. That the Applicant/Property Owner is responsible for obtaining all necessary Zoning Permits and Building Permits through the Department of Public Works as well as any other permits that may be required.

3. That the Applicant/Property Owner is responsible to meet all energy efficiency codes, and to maintain conformance with all applicable codes, regulations and guidelines (e.g. Burlington Electric Department's Guidelines for Energy Efficient Construction dated November 13, 2000).

4. That the Applicant/Property Owner is responsible to insure that all elements on the approved site plans, including landscaping, sidewalks and road connections, are installed as approved.

5. That the Applicant/Property Owner provide to the City's Public Works Department, prior to the commencement of construction, detailed construction drawings for the approved sanitary sewers, the approved erosion control and storm water drainage plan, and the approved water supply system, to enable the Department to review compliance during construction.

Related to during construction

6. During construction of the building and its infrastructure, that the Applicant/Property Owner require the contractors to provide dust control, including applications of water and/or calcium chloride as needed.

7. During construction of the building and its infrastructure, that the Applicant/Property Owner require the contractors to implement temporary erosion control measures in accordance with the " Vermont Handbook For Soil Erosion and Sedimentation Control On Construction Sites - Special Publication No. 3," including hay bale check dams, silt fencing, stabilized construction entrance, or other measures as required by site conditions. The Project Engineer or other designated professional shall inspect the construction erosion control devices on a routine basis and after every significant storm event (10 year event or greater) to ensure that these erosion control devices are maintained and functioning properly.

8. At the completion of building and infrastructure construction, that the Applicant/Property Owner require the site to be graded, covered with topsoil, and seeded, including mulching of all

exposed soil and sloped areas, to stabilize the site, and that any necessary erosion control devices remain in place and be maintained until the site has stabilized.

<u>Related to post-construction, prior to occupancy, or continuing during occupancy</u>

9. That a Zoning Certificate of Occupancy must be issued by the Department of Planning and Zoning prior to the use and/or occupancy of the subject premises; that prior to issuance of the Certificate of Occupancy, the Department of Code Enforcement must certify that work and conditions of approval associated with the Development Review Board application have been met; and that the Applicant/Property Owner must submit a Certificate of Completion certifying that the Project as described by the Applicant/Property Owner and approved [in this decision] has met its conditions of approval PRIOR to the issuance of the Certificate of Occupancy.

10. That the Applicant/Property Owner proposes to pay an impact fee in the amount of $91,896.60, to be paid to the Treasurer's Office at least seven (7) days prior to the issuance of the Certificate of Occupancy, calculated by the City as[1] $6,825.33 on account of 'T' impacts, $7,762.14 on account of 'F' impacts, $1,516.74 on account of 'PO' impacts, $25,963.02 on account of 'P' impacts, $16,148.82 on account of 'L' impacts, and $33,896.60 on account of 'S' impacts.

11. That the Applicant/Property Owner and any successor in interest provide a statement in the leases of the individual units that discloses the nearness and future use of the railroad tracks so that tenants are aware of the potential for noise and vibration that may occur.

12. That the Applicant/Property Owner is responsible to provide sufficient water flow and water pressure for domestic needs and for fire fighting.

<u>Article 5: Use, Density & Dimensional Requirements:</u>

The proposed 40-unit residential apartment building is a permitted use in the Waterfront Residential Medium Density zoning district. The allowed density for the site is 40 units, calculated under § 5.2.1 and § 5.2.2 as 1.65 acres times 20 units per acre, times 120% to apply the 20% density bonus for affordable housing units under § 14.1.14, which totals 39.6, which may be rounded up under § 5.2.3 to 40 units.

Section 5.3.2 of the Zoning Ordinance allows a maximum lot coverage of 72% for buildings, walks (excluding accessibility ramps), parking, drives, decks, patios and paved surfaces, plus an additional 10% for decks, patios, porches, terraces, game courts, and swimming pool aprons. The Project proposes only a 32% lot coverage, calculated as 23,728 square feet of coverage on a 74,291 square foot lot.

Section 5.3.5 and Table 5-D require a 15-foot front yard setback from the railroad right-of-way, from Lake Street, and from Depot Street, and a 20-foot side yard setback from the land of Burlington College to the north. No rear yard setback is applicable because the parcel is bordered

by public ways on more than one side. The proposed plans provide a 20.4-foot setback from the railroad; an approximately 225-foot setback from Lake Street; and a 39-foot setback from Depot Street, meeting the front yard setback requirements. The proposed plans provide a 34-foot setback from the land of Burlington College, meeting the side yard setback requirements.

Section 5.3.7 requires a 50-foot setback from the ordinary high water mark of Lake Champlain. The proposed plans provide an approximately 460 foot setback from the ordinary high water mark of the Lake.

Section 5.3.18(b)(2) allows a maximum height of 60 feet above average grade. The proposed apartment building is less than 50 feet above the average grade, including the small louvered penthouse structure that provides ventilation to equipment located inside on the top floor of the building.

Accordingly, the proposed apartment building meets all the requirements of Article 5.

Article 6: Design Review:

§ 6.1.10(a) - Relate Development to its Environment

The proposed apartment building relates well to its environment. It is placed within the sloped bank to the east and north to fit well in the topography of the land. It will be surrounded by existing trees and shrubs and planted landscaping to the north, east and south. The proposed building is of a scale, shape and materials so that it relates harmoniously to residential, institutional and industrial buildings and the mixed use and history of the formerly industrial waterfront neighborhood. The proposed building is sited below the elevation of North Avenue not visible above the ridgeline, nor does it intrude into the City' s skyline when viewed from below.

§ 6.1.10(b) - Preserve the Landscape

The landscape surrounding the proposed building will be stabilized and preserved by the site work and landscaping proposed for the project. The proposal will preserve the vegetated slopes to the east and north of the building and the proposed building has been sited to preserve the existing significant grove of cottonwood trees to the south.

§ 6.1.10(c) - Provide Open Space

The layout of the building provides defined open space within to the south and west of the building, available for gardening and play area use.

§ 6.1.10(d) - Provide Efficient and Effective Circulation

A sidewalk will connect the proposed building along Lake Street Extension to the waterfront and the downtown. The design separates vehicular and pedestrian circulation. Adequate circulation is provided for vehicles and emergency vehicles, including a reinforced emergency turnaround in

the open space area. Handicapped-accessible parking spaces are provided adjacent to the main entry, and access to the building is provided though ramps and elevators accessible to disabled and elderly persons.

§ 6.1.10(e) - Provide for Nature's Events

Stormwater will be collected by drains and swales and transferred primarily through underground piping to underground filter structures, and thence into the municipal stormwater system and to Lake Champlain, except for a swale conducting the stormwater flow currently draining from the undisturbed slope to the north of the building site to a culvert under the railroad line. The stormwater plan has been designed to meet the currently applicable requirements of the State of Vermont.

The roof of the building is an impermeable surface sloping gently in towards the center of the building to conduct rain and snowmelt to a stormwater pipe running down the interior of the building. An unobstructed area for snow to be plowed on site is provided directly adjacent to and west of the drive and north of the fire lane, from which snow will be removed from the site. Building entrances will be protected from precipitation by an integral canopy.

§ 6.1.10(f), related to making advertising features understandable, is inapplicable to the proposed apartment building which has no advertising features.

§ 6.1.10(g) - Integrate Special Features with the Design

The trash collection area is proposed to be screened from the main pedestrian walks and building entrance by trees and shrubs chosen for their fragrance to offset any disagreeable odors from the accumulating trash. Mailboxes and electric meters are located indoors, while the gas meter located on the east side of the building and will be boxed in and screened from view.

§ 6.1.10(h) - Make Spaces Secure and Safe

The garage is designed only partially underground so that it will be both visible and audible from the outside, enhancing the security of residents using the garage spaces. The emergency vehicle turn-around has been designed with a 50-foot radius to allow fire trucks to maneuver close to the building. The stabilization of the Depot Street slope will also enhance access by emergency vehicles. The building and site are accessible by fire, police and rescue personnel.

Lighting that has been designed to shed no direct light beyond the site perimeters will illuminate the outside of the building to the north and east of the building to provide additional security.

The fire suppression system for the building has been designed to exceed the requirements of all applicable codes, and the building will conform to the life safety requirements of the applicable building and fire safety codes at the time the building receives its building permit.

§ 6.1.10(i) - Protect Burlington's Heritage

There are no existing structures or architectural features on the site or adjacent to the site requiring preservation. The scale and materials of the proposed building provide a visual transition to the nearby Moran Plant and the historic waterfront buildings, and blend well with the neighborhood.

## § 6.1.10(j) - Consider the Microclimate

The site and building are designed to obtain some passive solar gain to the building, to shade the entryways, and to use native vegetation in the landscape plan. The design minimizes any effect on the light, air, water, noise and temperature experienced in the surrounding area.

## § 6.1.11[2](a) - Protect Existing Scale and Streetscape

Like other structures to the south on Lake Street, the proposed building is set at the toe of a slope and its roof is well below the elevation of North Avenue, making it compatible withe the existing scale and streetscape. The layout, scale, materials and design of the building and the lot is consistent and compatible with other development in the area, and compatible with the neighborhood structures on the top of the slope at North Avenue.

## § 6.1.11(b) - Protect Views and View Corridors

The proposed building is located at the base of the slope and will not affect views of Lake Champlain or the Adirondack Mountains for adjacent sections of the community.

## § 6.1.11(c) - Consider the City Skyline

The proposed building will be below the level of the top of the sloped bank to the east and consequently will not have any effect on the City's skyline. The effect of the relatively flat roof has been carefully considered; it is designed to avoid affecting the view over the building either from the east or the west and to enable the building to blend visually into the hillside.

## § 6.1.11(d) - Protect Solar Access

Because of the location of the building, no shadows will be cast on adjacent lands or buildings and will not block solar utilization on the site or adjacent lands.

## § 6.1.11(e) - Reduce Energy Utilization

The proposed building design incorporates best available technologies and materials. The energy performance of the proposed building is designed to reduce energy operating cost by at least 40% over the baseline construction requirements described in ASHRAE/IESNA Standard 90.1-1999 and the energy efficiency measures dictated by existing regulations. The Project meets the requirements of Leadership in Energy and Environmental Design and incorporates water saving devices, electricity saving devices and an energy efficient window system.

## § 6.1.11(f) - Minimize Shadow Impacts

The proposed building is designed and oriented to provide maximum sunlight on all public areas. The L-shaped building is oriented to allow for good solar access to the south and west.

## § 6.1.11(g) - Conceal Rooftop Devices

No exposed rooftop equipment is proposed. An inconspicuous 42" high louvered structure on the roof will provide ventilation for the mechanical equipment located inside the building on the fourth floor.

## § 6.1.11(h) - Provide Pedestrian Corridor for Waterfront Access

The proposed building is blocked by the railroad from providing a pedestrian corridor between the building and the waterfront, and none is required under the ordinance. Pedestrian access to the waterfront is available along Lake Street to sidewalks and the bike path to Waterfront Park.

## § 6.1.11(i) - Make Service Access Secondary to Pedestrian Access

Pedestrian access to the site is separate from the service access.

## § 6.1.11(j) - Achieve Design Excellence

The proposed building design has achieved design excellence. The scale and L-shaped design of the building avoid the appearance of an anonymous institutional building. The design scales down the overall mass of the building to a comfortable residential scale by using a variety of materials, textures and colors related to those used in the neighborhood, and incorporating decks and a roof overhang that create shadows. These techniques achieve the creation of a building base that ties in visually to the landscape, a middle building mass, and a distinctive upper floor and roof shape that caps the building at the sky. The building placement is integrated with the sloped bank to the east and north to work with the curve of the slopes. The height and mass of the building provides a visual transition between the taller and more industrial Moran Plant and nearby residential buildings.

Accordingly, the proposed apartment building meets all the applicable requirements of Article 6.

Article 7: Site Plan Review:

## § 7.1.6(a) - Adequacy of Traffic Access

One curb cut is proposed on Depot Street, near a jog in Lake Street Extension, which is designed to continue to the southern edge of the project property. North of the curb cut, Depot Street is limited to emergency vehicle use, minimizing the possibility of any conflicting traffic. All vehicles will enter and exit the property via this southern entrance, which is adequate for the anticipated maximum of 25 vehicle trip ends in the peak hour. Appellant argues that potentially all the residents could leave the building in a vehicle in the same hour, but presented no traffic engineering data to support that supposition.

§ 7.1.6(b) - Adequacy of Traffic Circulation and Parking

Twenty-seven of the on-site parking spaces are under the building in the parking garage, with an additional eighteen in an outside parking area along the access drive to the south of the building. A three-point turn-around and fire lane is provided for emergency vehicles. The trash collection area is placed on the side of the vehicle access so that it is convenient for residents' use but also accessible to the pickup vehicles. An adequate area is provided for loading and unloading in front of the building entrance.

§ 7.1.6(c) - Adequacy of Landscaping and Screening

The entire site will be extensively landscaped. After the slope to the east of the proposed building is regraded to ensure slope stability and prevent erosion, it will be landscaped with naturalized plantings to screen the proposed building from adjacent lands without blocking views of the lake and to provide additional slope stability. Adjacent existing trees and vegetation will be preserved. Due to the location of the building in the landscape, no additional screening is required. Appellant is concerned that the lighting proposed for the east and north walls of the building will " direct artificial light eastward into existing residences on North Avenue," however, that lighting is proposed for the walls at the ground floor level in those locations, and is proposed to be provided by fixtures which shield any direct light, with the result that the hillside to the east of the proposed building will itself screen the indirect light from any residences above the building site on North Avenue.

§ 7.1.6(d) - Adequate Protection of the Use of Renewable Energy Resources

With regard to solar energy resources, the proposed building will not shade adjacent lands, and is designed for passive solar gain. It may be used to support active solar collection if desired in the future. With regard to wind energy resources, the site is located on the lakefront and below the sloped bank to the east, and therefore will not block wind from any adjacent land. Hydropower resources are not applicable as no hydropower generating resources exist on the site, nor will the proposal impede access to renewable organic fuel on adjacent land.

Accordingly, the proposed apartment building and its associated site plan meets all the requirements of Article 7.

Article 10: Parking Regulations

Appellee-Applicants propose to provide 45 parking spaces, designated as 40 spaces for the residents of the building and five spaces for visitors. They request a waiver to reduce the parking spaces from the 68 spaces that otherwise would be required for 40 dwelling units, calculated under § 10.1.8 as 2 spaces for each of the first four units and 1.5 spaces for each of the remaining 36 units, plus 10% for designated visitor parking

Appellee-Applicants propose the waiver to reduce the parking space requirements by 23 spaces, based on the reduced parking needs characteristic of affordable housing units, as other affordable housing units managed by the Burlington Community Land Trust average only .7 vehicles per

dwelling unit. Further, the proposed building is located in close proximity to the bike path, a reasonable walking distance from the downtown business area, and near public bus transportation service (and the potential for train service). It therefore qualifies for the requested 23-space parking space waiver under § 10.1.19(c) and (d).

The proposed parking spaces are designed to meet the dimensional requirements of § 10.1.10 and Table 10-C of the Zoning Ordinance. All the parking spaces are proposed to be 9 feet in width. Thirty-seven of the parking spaces are proposed to be 20 feet in length for the angled parking spaces and 22 feet in length for the parallel parking spaces, with travel aisles 20 feet in width. The remaining eight spaces in the garage are designated for compact cars, 18 feet in length with ample travel aisles.

The lighting for the parking areas is designed so that all direct rays fall within the parking lot or walks and not off-site. The lighting is designed to use cut-off type light fixtures to direct the light to avoid glare and assure that no direct beam illumination extends beyond the site. The pole-mounted fixtures are proposed not to exceed 16 feet in height, less than the 22-foot height allowed in the Zoning Ordinance. § 10.1.17

Accordingly, the proposed apartment building, and its associated parking design, including the 23-space waiver approved in this section, meets all the requirements of Article 10.

Article 13: Major Impact Developments

§ 13.1.6(a) - The proposed development shall not result in undue water, air or noise pollution.

Water Pollution - Stormwater: The stormwater plan will treat runoff from the site in accordance with the Vermont State standards for stormwater treatment, and is designed to handle a 100-year storm event. The stormwater system is designed to meet the state and federal requirements for removal of total suspended solids and total phosphorus. It will collect the storm water in catch basins and pipe it underground to two underground filter structures in Lake Street Extension and into the municipal stormwater system. On the north side of the building site at the foot of the northerly slope, a swale will collect and treat the stormwater running off the undisturbed northerly slope, and direct it through an existing culvert under the railroad tracks.

Water Pollution - Sanitary Sewers: The proposed apartment building will generate residential domestic wastewater; it will generate no industrial or manufacturing process waste water. All wastewater from the proposed apartment building will be disposed of through the municipal wastewater sewer system to be treated at the main municipal wastewater treatment plant. The municipal wastewater system has sufficient capacity to serve the proposed apartment building.

Air Pollution: As a residential apartment building and does not include any manufacturing or industrial processes that would create air pollution with any undue adverse effect on air quality. During construction, Appellee-Applicants will require contractors to provide dust control, including applications of water and/or calcium chloride as needed to avoid any undue adverse effect on air quality during construction

Noise Pollution: The proposed apartment building does not include any manufacturing or industrial processes that would create undue noise. Most of the apartments face Lake Champlain, the bike path, the Moran Plant and Battery Park. Only 4 apartments will have decks on the side of the building facing east towards North Avenue and Appellant's building. Appellant is concerned that the slope of the land will function as a natural amphitheater to funnel noise from the building upwards to North Avenue, but presented no evidence that the noise from the building would be excessive or other than that expected from a multi-family residential use in an urban setting near the train tracks and bike path. The building itself will mitigate any noise experienced at residences on North Avenue from the building's own play area. Of course, the residents will experience noise and vibration from the passage of trains along the nearby train tracks. Although this feature of the site may be obvious to prospective tenants, Appellee-Applicants have agreed to warn tenants of this feature in the lease agreements, to avoid any future disputes or misunderstandings.

§ 13.1.6(b) - The proposed development shall have sufficient water available for its needs.

§ 13.1.6(c) - The proposed development shall not unreasonably burden the city's present or future water supply or distribution system.

The proposed building will receive water service from the City's municipal water supply system through a service main to an existing water supply line along Depot Street, in a volume which will be sufficient to meet both the building's fire protection and its residential needs. The municipal water supply system has sufficient capacity to serve the proposed building.

§ 13.1.6(d) - The proposed development shall not cause unreasonable soil erosion or reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result.

To the extent that the existing instability of the slope near Depot Street constitutes a dangerous condition, the proposed site work will improve it; that is, it will be regraded and reinforced by means of geo-grids and plantings to prevent further subsidence.

Temporary erosion control measures will be implemented during construction in accordance with the "Vermont Handbook For Soil Erosion and Sedimentation Control On Construction Sites," which are expected to include hay bale check dams and silt fencing. The site will be graded, covered with topsoil and seeded, and exposed soil and sloped areas will be mulched and covered with jute matting as necessary. Swales associated with the stormwater system will be lined with stone where necessary to prevent erosion. The combination of landscaping, geo-grids, pavement and sidewalks will prevent erosion once the site has stabilized, and the necessary temporary erosion control devices will remain in place and be maintained until the site has stabilized. Appellant is concerned that erosion of contaminated soils will occur during construction; however, this will be prevented during construction as soils will be tested as they are exposed and will be removed from the site if contaminated. Soils frm the hillside that will undergo regrading are not expected to be contaminated; the issue of contamination arises primarily regarding soils in the flat building site next to the railroad tracks.

The stormwater system has been designed to be of sufficient capacity to provide for controlled runoff of stormwater from all surfaces on the site and building.

§ 13.1.6(e) - The proposed development shall not cause unreasonable congestion or unsafe conditions on highways, streets, waterways, railways, bikeways, pedestrian pathways or other means of transportation, existing or proposed.

The proposed building is expected to generate no more than 25 vehicle trip ends in the peak hour. This level of traffic generation will not cause congestion or unsafe conditions on any of the means of transportation listed in this criterion. The sidewalks and nearby bicycle path have sufficient capacity to handle the pedestrian and bicycle traffic that may be generated by the residents.

§ 13.1.6(f) - The proposed development shall not place an unreasonable burden on the city's ability to provide educational services.

The proposed building is estimated to house approximately 42 school-age residents, in the two- and three-bedroom units. The Burlington school system has sufficient capacity to serve the students who will live in the proposed building. In addition, a portion of the impact fees are allocated to offset the school system costs associated with this proposal.

§ 13.1.6(g) - The proposed development shall not place an unreasonable burden on the ability of the city to provide municipal services.

The City has the capacity to provide all necessary municipal services to the proposed building and its residents. In addition, the impact fees are allocated to offset the costs of municipal services associated with this proposal.

§ 13.1.6(h) - The proposed development shall not have an undue adverse effect on rare, irreplaceable or significant natural areas, historic or archaeological sites, nor on the scenic or natural beauty of the area or any part of the city.

The site does not contain any rare, irreplaceable, or significant natural areas or historic or archaeological sites. The scenic or natural beauty of the site and its immediate surroundings, consisting of the sloped bank to the north of the building and the significant trees to the south of the building, will be preserved. The proposed building has been designed to fit in with the site and to avoid any adverse effects on the views of the city skyline seen from the west or of the lake and mountains seen from the east.

§ 13.1.6(i) - The proposed development shall not have an undue adverse effect on the city's present or future growth patterns, or the city's fiscal ability to accommodate such growth, or on the city's investment in public services and facilities.

The proposed building will occupy a currently vacant site in a district of the City designated for in-filling by residential uses, under the zoning district designation, and the municipal plan. It is also within a downtown area designated by the State, and within a growth center designated by

the Chittenden County Regional Plan. It will be consistent with the City' s growth patterns, and will have no undue adverse effect on the City' s ability to accommodate that growth. Moreover, an impact fee will be paid in connection with the proposed building to help offset municipal costs associated with the residential development.

§ 13.1.6(j) - The proposed development shall be in substantial conformance with the city's municipal development plan.

The Project is in conformance with the City' s 2001 Municipal Development Plan to develop a mixed-use neighborhood in the downtown waterfront that remains an economically inclusive area and avoids exclusively high-income private development. (Page I-15). In particular it meets the goals and policies of the Plan to encourage a wide range of housing options to meet different and changing needs of households with children, the elderly, people with disabilities, and moderate and low income households (page IX-2); to encourage development that complements its natural setting (page III-1); and to ensure that people with disabilities have equal access to the built environment (page III-2); as well as to ensure that building design takes into account Burlington' s northern climate(page III-2), and to place the appropriate fiscal burden of facilities and utilities on the users. (page VII-2).

Appellant claims that it is in the " Urban Reserve" area that the plan does not intend for develop, and that it is located on steep slopes which should be protected from development. However, the building area of this site does not involve a steep slope, and the steep slopes elsewhere on the site are being stabilized and revegetated. The plan for the site therefore meets the municipal plan' s goal (page II-6) to avoid construction, cutting and filling, and loss of vegetation on the steep slopes. Even if the property is within the ' Urban Reserve' boundaries, it is on an edge of the ' Urban Reserve' that does have access to existing infrastructure, the lack of which otherwise would make new development in that area overly costly. The proposed building fits well within the plan' s goals for development of the waterfront area nearest the downtown, as well as the purposes of the Waterfront Residential Medium Density zoning district.

§ 13.1.6(k) - The proposed development shall not have an undue adverse impact on the present or projected housing needs of the city in terms of amount, type, affordability, and location.

The proposed building will have a beneficial impact on the housing needs of the City, in particular in terms of the affordability and location of this rental housing. See also, Article 14, below.

§ 13.1.6(*l*) - The proposed development shall not have an undue adverse impact on the present or projected park and recreation needs of the city.

Sufficient park and recreational facilities exist in the immediate vicinity to this site to accommodate the proposed development, including Waterfront Park, North Beach, and the bicycle path. In addition, a portion of the impact fee is allocated to offset the costs of municipal park and recreation facilities associated with this proposal.

Accordingly, the proposed apartment building and its associated site plan meets all the requirements of Article 10.

Article 14. Inclusionary Zoning

The proposed apartment building will meet the requirements of Article 14, addressing inclusionary zoning. Indeed, its primary purpose is to provide affordable housing in the downtown area of Burlington. As all but six of the forty units are designated as affordable, it provides a sufficient number of affordable units to qualify for the density bonus discussed above under Article 5.

Section 17.1.5 - Conditional Use Criteria (made applicable to the project by Article 13.1.5)

(1) The capacity of existing or planned community facilities

The site is a vacant lot located in the City's downtown waterfront area. Nearby existing public infrastructure has sufficient capacity to serve the proposed building without any significant impact on the capacity of existing or planned community facilities.

(2) The character of the area affected

This building fits the site and the emerging residential character of the area, and by its design and materials blends in with the non-residential mixed uses in the waterfront character as well. The proposed building and its site are consistent area affected.

(3) Traffic on roads and highways in the vicinity

The proposed building is expected to generate no more than 25 vehicle trip ends in the peak hour. This level of traffic generation will not adversely affect the traffic on roads and highways in the vicinity.

(4) Bylaws then in effect

The proposal meets applicable zoning bylaws, as discussed throughout this decision.

(5) Utilization of renewable energy resources - see above under §§ 6.1.11 and 7.1.6.

Accordingly, the proposed apartment building and its associated site plan meets all the requirements of § 17.1.5, made applicable to the proposal by § 13.1.5.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the proposal meets all the required criteria under the City's Zoning Ordinance, and is hereby APPROVED, with the agreed specific conditions of approval outlined on pages 4 through 6 of this decision and the agreed so-called standard conditions of approval placed in all permits by the City. This is a final and

appealable decision and order concluding this case. However, any party wishing a separate judgment order in the form of a Certificate of Appropriateness consistent with this decision, may circulate such proposed order for form and submit it to the Court.

Dated at Barre, Vermont, this 2nd day of May, 2003.

_____
Merideth Wright
Environmental Judge

## Footnotes

[1.] Please note that the subsidiary amounts do not appear to add up exactly to the total impact fee proposed, and that no key to the abbreviations has been provided, although the Court suspects they may stand for T[raffic], F[ire], PO[lice], [P]arks, L[ibrary] and S[chools].

[2.] It appears that the proposed building is in the WRM district, just east of the Waterfront Core districts to which these sections apply. However, as the parties addressed these criteria, the Court will also address them.